JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.
**337 In this case, we consider whether police officers violated the Fourth Amendment of the United States Constitution and **338 Article 1, Paragraph 7 of the New Jersey Constitution when they took a sample of defendant's blood without a warrant during an investigation of alleged driving while intoxicated (DWI).
Defendant Shayna Zalcberg was driving in Freehold Township when her vehicle, containing two passengers, struck another. The collision resulted in a serious accident. Emergency assistance was required, and all three occupants of defendant's vehicle were transported to a hospital via helicopter. One of defendant's passengers died from his injuries.
Police arrived at the scene and determined there was probable cause to believe that alcohol had contributed to the collision. As a result, one of the officers went to the hospital to obtain a sample of defendant's blood. At no time was there discussion of procuring a warrant before ordering the blood draw. Defendant was later charged with second-degree vehicular *306 homicide and assault by auto. Defendant moved to suppress the results of the warrantless blood draw as violative of the Fourth Amendment. The trial court granted the motion, finding that the exigent circumstances exception to the warrant requirement did not apply here; the Appellate Division affirmed substantially for the reasons expressed by the trial court.
We conclude that the totality of the circumstances evince an objective exigency, relaxing the need for a warrant and rendering the officer's warrantless blood draw constitutional. Accordingly, we reverse the judgment of the Appellate Division and remand this matter to the trial court.
I.
A.
On the night of July 27, 2011, the Freehold Township Police Department received a report of a motor vehicle accident and dispatched officers to the scene. On their arrival, the officers determined that the accident was serious and called emergency medical and fire personnel for assistance. The police secured the **339 roadway so that no other vehicles could approach the crash in order to render the situation less dangerous for the first responders. Because the accident scene was on a major thoroughfare and the crash coincided with the first night of the heavily trafficked Monmouth County Fair, several officers were deployed to block off access to the road and to direct traffic. They continued to do so throughout the entirety of the accident investigation.
Emergency personnel arrived and observed that the doors of the vehicle driven by defendant could not be opened due to the impact of the crash. Members of the fire department employed the "Jaws of Life" to remove the top of the vehicle's passenger compartment and extricate its three occupants. All three were transported via helicopter to Jersey Shore Medical Center for treatment. One of the passengers of defendant's vehicle eventually died as a result of injuries sustained in the accident.
In the course of the police officers' investigation of the collision scene, suspicions arose that alcohol may have played a role in the accident. Two of the emergency medical personnel expressed their concern to a police officer that defendant had smelled of alcohol. Further, after the top of defendant's vehicle had been removed, officers observed a miniature bottle of an alcoholic beverage in the vehicle's console.
The officers concluded that there was probable cause to believe that defendant had been driving while under the influence of alcohol. Because defendant was incapacitated as a result of her injuries and therefore unable to undergo field sobriety tests, the officers decided that it would be prudent to obtain a sample of defendant's blood.
At the time of the accident, it was common practice in the Freehold Township Police Department to take blood samples in serious motor vehicle accidents. Warrants were then available telephonically under New Jersey Court Rule 3:5-3(b), but none of the police officers present believed that a search warrant was required to obtain a blood sample and none of them had been trained in obtaining one. Thus, there was no discussion about **340 obtaining a search warrant for the sample of defendant's blood. An officer was dispatched to Jersey Shore Medical Center to acquire the sample.
The officer arrived at the hospital shortly thereafter and inquired into defendant's location. The officer was instructed that he would have to wait but was not given an estimate as to how long. About an hour *307 later, the officer was granted access to defendant and requested that a nurse obtain a sample of her blood. The nurse extracted the blood sample and delivered it to the officer.
B.
A grand jury charged defendant with second-degree vehicular homicide, contrary to N.J.S.A. 2C:11-5 ; two counts of third-degree assault by auto, contrary to N.J.S.A. 2C:12-1(c)(2) ; and fourth-degree assault by auto, contrary to N.J.S.A. 2C:12-1(c)(2).
Defendant filed a pre-trial motion to suppress the results of the warrantless blood test, and a suppression hearing was conducted. In an oral decision, the judge granted defendant's motion to suppress. The Judge relied on the United States Supreme Court's decision in Missouri v. McNeely, 569 U.S. 141, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013), in which the U.S. Supreme Court reaffirmed that the dissipation of alcohol from one's blood does not constitute a per se exigency justifying a warrantless blood draw. The State filed a motion to appeal that decision, which the Appellate Division granted.
While the State's appeal was pending, an Appellate Division panel in another case held that McNeely was not retroactive but instead prospective. See State v. Adkins, 433 N.J.Super. 479, 484-93, 81 A.3d 680 (App. Div. 2013), rev'd, 221 N.J. 300, 113 A.3d 734 (2015). Based on the Adkins appellate ruling, the Appellate Division panel here reversed the order granting defendant's motion to suppress.
We granted defendant's motion for leave to appeal from the Appellate Division's reversal. Shortly thereafter, we decided **341 State v. Adkins, 221 N.J. 300, 303, 113 A.3d 734 (2015), which mandated that McNeely be afforded pipeline retroactivity. In light of that pronouncement, we summarily reversed the Appellate Division decision in Zalcberg and remanded for a new suppression hearing "in order that exigency may be assessed on a newly developed and more full record in light of this Court's holding in State v. Adkins."
On remand, the trial court again granted defendant's motion to suppress in a written opinion. After finding that the officers had probable cause to obtain a blood sample, the judge held that the State failed to establish that an exigency existed sufficient to constitute a recognized exception to the warrant requirement. The judge underscored the amount of time that elapsed between the establishment of probable cause and the taking of the blood sample-including the hour the dispatched officer waited at the hospital before locating defendant-in rejecting the State's exigency argument. Further, the judge concluded that the officers could and should have obtained a search warrant because telephonic warrants were available to them. The judge determined, based upon the totality of the circumstances, that the only exigency the State could establish was the natural metabolization of alcohol in defendant's blood, which was alone insufficient to justify a warrantless blood draw under McNeely and Adkins.
In an unpublished per curiam opinion, an Appellate Division panel affirmed, substantially for the reasons expressed in the trial judge's written decision. We granted the State's motion for leave to appeal. 229 N.J. 249, 161 A.3d 759 (2017). We also granted the Attorney General leave to appear as amicus curiae.
II.
A.
The State asserts that suppression of the results of the warrantless blood draw was in error.
*308 **342 First, the State explains that the trial and appellate courts failed to evaluate the totality of the circumstances in determining exigency. In the State's view, it is vital to consider that the officers, before allowing the roadway to be reopened to traffic, needed to investigate a serious car crash requiring the "Jaws of Life" and the assistance of three medevac helicopters, interview eye-witnesses, and collect all evidence necessary to determine the cause and manner of the collision. Moreover, the State urges that courts should ascribe "substantial weight" to the perceived dissipation of alcohol evidence that the officers reasonably faced, citing Adkins, 221 N.J. at 317, 113 A.3d 734.
According to the State, a determination, made with the benefit of hindsight, as to the preferred allocation of police resources cannot be substituted for an objective exigency analysis. Thus, the State argues, it is error to focus on the time between the probable cause finding and the officers' actions. The State reads the trial and appellate decisions to imply that any purported exigency was not legitimate because the officers did not immediately attempt to obtain a blood sample from defendant as soon as probable cause was established. The State urges that such a "time-specific conclusion" effectively amounts to requiring officers to apply for a warrant immediately upon acquiring probable cause.
Further, the State highlights testimony tending to show that telephonic warrants, for all intents and purposes, were unavailable to the officers on the night in question. The State stresses that although our court rules provided for telephonic warrants at the time of the accident in theory, there was neither a "workable statewide procedure" nor a formalized procedure within Monmouth County to facilitate procuring such warrants in practice.
B.
The Attorney General, appearing as amicus curiae, agrees with the State that exigent circumstances justified the warrantless blood draw at issue in this case. The Attorney General urges this Court to focus on the objective reasonableness of the officers'
**343 actions rather than the potential of obtaining a warrant. To that end, the Attorney General requests that this Court compare the "special" factual predicate underlying this case to the facts in State v. Jones, 441 N.J.Super. 317, 118 A.3d 352 (App. Div. 2015), a case in which the Appellate Division found a warrantless blood draw justified by exigency based on a totality of the circumstances analysis.
The Attorney General distinguishes this case from McNeely, which it characterizes as a "routine DWI case" in which the purported "exigency was based solely on the natural dissipation of alcohol in the bloodstream that would have threatened the destruction of the evidence." The Attorney General underscores, by contrast, the non-routine circumstances present in this case that demonstrate that the officers faced objective exigency: the presence of multiple injured parties and an unconscious defendant; the use of the "Jaws of Life", various emergency personnel services, and medevac helicopters; a limited number of available police officers; and the need to secure the roadway and redirect heavy traffic to conduct its investigation.
C.
Defendant submits that the warrantless blood draw here cannot be validated under the exigency exception to the warrant requirement.
In defendant's view, the State and the Attorney General have presented a "revisionist" version of events to help fit this case within the metes and bounds of the *309 exigency doctrine. According to defendant, the reality is that the officers were under the mistaken impression that they did not require any type of warrant to obtain defendant's blood. Any argument that the dissipation of evidence in defendant's blood supports exigency is belied by the officers' inaction for over an hour after developing probable cause, defendant contends.
Defendant argues that the State appears to advocate for a new exception to the warrant requirement, which defendant calls "the **344 accident exception." Such an exception, defendant claims, would mean that a warrant is not required for any driver involved in a motor vehicle accident who is suspected of DWI. According to defendant, such a per se exception cannot be squared with the precedents of the United States Supreme Court and this Court. Instead, defendant submits that the trial court properly "considered the totality of the circumstances" and rightly determined that "the objective exigency of the circumstances faced by the officers" did not justify the warrantless search here.
Second, defendant asserts that the lack of a formalized telephonic warrant procedure on the night in question is of no consequence. Defendant avers that, had the officers made an attempt to seek legal guidance, an assistant prosecutor could have assisted them in obtaining a telephonic warrant. Defendant therefore submits not only that it was possible for the officers to obtain a telephonic warrant, but also that there was no justification for the officers' failure to seek one before drawing defendant's blood.
III.
A.
In reviewing the decision of a trial judge to grant or deny a motion to suppress, an appellate court must give deference "to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record." State v. Hubbard, 222 N.J. 249, 262, 118 A.3d 314 (2015). Findings of the trial court should be set aside "only when [the] court's findings of fact are clearly mistaken ... [and] the interests of justice require the reviewing court to examine the record, make findings of fact, and apply the governing law." Id. at 262-63, 118 A.3d 314. However, "[w]e owe no deference to a trial or appellate court's interpretation of the law, and therefore our review of legal matters is de novo." State v. Hathaway, 222 N.J. 453, 467, 120 A.3d 155 (2015).
**345 B.
The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution equally guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV ; accord N.J. Const. art. I, ¶ 7. Therefore, a warrantless search is constitutionally invalid unless one of the few "well-delineated exceptions to the warrant requirement" applies. State v. Gonzales, 227 N.J. 77, 90, 148 A.3d 407 (2016) (quoting State v. Edmonds, 211 N.J. 117, 130, 47 A.3d 737 (2012) ).
One such exception is the presence of exigent circumstances. See State v. Johnson, 193 N.J. 528, 552, 940 A.2d 1185 (2008). There is no defined formula for determining whether there are exigent circumstances, and the term may take on different shape and form depending on the facts of a given case. State v. DeLuca, 168 N.J. 626, 632, 775 A.2d 1284 (2001). Absent a precise definition, applying the exigency doctrine "demands a fact-sensitive, objective analysis" based on the totality of the circumstances. Ibid. However, "some factors *310 to be considered in determining" exigency include "the urgency of the situation, the time it will take to secure a warrant, the seriousness of the crime under investigation, and the threat that evidence will be destroyed or lost or that the physical well-being of people will be endangered unless immediate action is taken." Johnson, 193 N.J. at 552-53, 940 A.2d 1185. The exigent-circumstances exception is frequently cited in connection with warrantless blood draws.
In Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the United States Supreme Court established that a compelled taking of a blood sample for the purpose of alcohol-content analysis constitutes a search within the Fourth Amendment's framework. Schmerber dealt with a defendant driving an automobile involved in a single-car accident. Id. at 758, 86 S.Ct. 1826 & n.2. The police officer who arrived at the scene smelled alcohol on the defendant's breath and observed that his **346 eyes appeared "bloodshot," "watery," and "glassy." Id. at 769, 86 S.Ct. 1826. Within two hours of the accident, the officer arrived at the hospital, where the defendant, receiving treatment for his injuries, continued to display signs of intoxication. Id. at 769, 86 S.Ct. 1826. The officer placed the defendant under arrest and, without procuring a warrant, directed a physician to draw a sample of his blood. Id. at 758, 86 S.Ct. 1826. The test results confirmed that the defendant was intoxicated, and he was ultimately convicted of driving under the influence. Id. at 758-59, 86 S.Ct. 1826.
The Supreme Court determined that a blood test is an "intrusion[ ] into the human body" and therefore constitutes a search and seizure within the meaning of the Fourth Amendment. Id. at 767, 86 S.Ct. 1826. Thus, the Supreme Court concluded, because "warrants are ordinarily required for searches of dwellings, ... absent an emergency, no less could be required" for drawing blood. Id. at 770, 86 S.Ct. 1826.
The Court held, however, that under the facts presented, the officer "might reasonably have believed that he was confronted with an emergency." Ibid. Specifically, the Court found that, between bringing the defendant to the hospital and investigating the accident, "there was no time to seek out a magistrate and secure a warrant" because any further delay would have threatened the destruction of evidence through the natural metabolization of any alcohol in the defendant's body. Id. at 770-71, 86 S.Ct. 1826. Thus, the Supreme Court found no Fourth Amendment violation based on the record presented. Id. at 772, 86 S.Ct. 1826.
Approximately fifty years later, in Missouri v. McNeely, 569 U.S. 141, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013), the Supreme Court resolved post- Schmerber confusion about whether the natural metabolic breakdown of alcohol constitutes a per se exigency that permits warrantless blood testing in cases of drunk driving.
McNeely involved a police officer who observed a truck driven by the defendant traveling at excessive speeds and swerving between lanes. Id. at 145, 133 S.Ct. 1552. After stopping the truck, **347 the officer observed several signs of the defendant's potential intoxication, and the defendant admitted to having drunk two beers. Ibid. That prompted the officer to administer field sobriety tests, which the defendant ultimately failed. Ibid. When the defendant refused a breathalyzer, the officer arrested him, brought him to a hospital, and directed a lab technician to draw a blood sample. Id. at 145-46, 133 S.Ct. 1552. The officer neither obtained the defendant's consent for the blood test nor attempted to secure a warrant. Id. at 146, 133 S.Ct. 1552. After *311 being charged with driving while intoxicated, the defendant moved to suppress the blood test results. Ibid.
On appeal, the U.S. Supreme Court clarified that
while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in Schmerber, it does not do so categorically. Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances.
[ Id. at 156, 133 S.Ct. 1552.]
In rejecting a categorical rule for blood-alcohol testing, the Court impressed that "some delay between the time of the arrest or accident and the time of the [blood] test is inevitable regardless of whether police officers are required to obtain a warrant." Id. at 153, 133 S.Ct. 1552. The Court envisioned instances, such as a setting in which "an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer," that would not significantly delay conducting a blood test-especially given the availability of telephonic and electronic warrants. Ibid. Thus, the Court held that if a police officer "can reasonably obtain a warrant" for a blood test "without significantly undermining the efficacy of the search, [then] the Fourth Amendment mandates that they do so." Id. at 152, 133 S.Ct. 1552 (citing McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948) ).
The Missouri Supreme Court had previously found that, apart from the dissipation of blood-alcohol evidence, "there were no circumstances suggesting the officer faced an emergency in which he could not practicably obtain a warrant."
**348 Id. at 146, 133 S.Ct. 1552. Therefore, the Court affirmed the Missouri Supreme Court's determination that the blood draw violated the Fourth Amendment, id. at 147, 133 S.Ct. 1552, concluding that the metabolization of alcohol "does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant," id. at 165, 133 S.Ct. 1552 (emphasis added).
C.
In 2015, we granted certification in Adkins to address the retroactive application of McNeely to drunk-driving cases in New Jersey.
Prior to McNeely, New Jersey, like many states, "provided de facto, if not de jure, support for law enforcement to believe that alcohol dissipation in and of itself supported a finding of exigency for a warrantless search of bodily fluids in suspected driving-under-the-influence cases." Adkins, 221 N.J. at 303, 113 A.3d 734. Based on that pre- McNeely understanding, the defendant in Adkins, suspected of drunk driving, was subjected to a warrantless blood test following a single-car accident. Id. at 302, 113 A.3d 734.
The defendant successfully moved for suppression of the blood test results before the trial court, but the Appellate Division reversed on the ground that the officers had "relied on pre- McNeely New Jersey case law." Id. at 302-03, 113 A.3d 734. On appeal, this Court pronounced that McNeely's directive-that "courts must evaluate the totality of the circumstances in assessing exigency, one factor of which is the human body's natural dissipation of alcohol"-would receive "pipeline retroactivity." Id. at 312, 317, 113 A.3d 734.
We acknowledged that pre- McNeely"case law played a leading role in dissuading police from believing that they needed to seek, or explaining why they did not seek, a warrant before obtaining an involuntary blood draw."
*312 Id. at 317, 113 A.3d 734. Yet, aligned with our rejection of the good faith exception to the exclusionary rule, id. at 314-15, 113 A.3d 734, we directed that "in reexamining pipeline cases when police may have believed that they did not **349 have to evaluate whether a warrant could be obtained," reviewing courts must "focus on the objective exigency of the circumstances that the officer faced in the situation," id. at 317, 113 A.3d 734 (emphasis added).
Ultimately, we reversed the Appellate Division and remanded for a new suppression hearing, permitting the State and the defendant to re-present their positions on exigency in light of McNeely. Id. at 303, 113 A.3d 734. In so remanding, however, we stated that the "potential dissipation of [blood-alcohol] evidence may be given substantial weight as a factor to be considered in the totality of the circumstances." Ibid. (emphasis added).
D.
In State v. Jones, the Appellate Division determined that a warrantless blood draw was constitutional under the totality of the circumstances. 441 N.J. Super. at 321, 118 A.3d 352.
Jones involved a defendant who caused a three-vehicle accident at a heavily traveled intersection during rush hour. State v. Jones (Jones I ), 437 N.J.Super. 68, 71, 96 A.3d 297 (App. Div. 2014). Several police officers, EMS personnel, and firefighters arrived to manage the scene and tend to the occupants of the three vehicles. Ibid. The defendant was unconscious in her car and bleeding from her face; it took half an hour to remove her from her vehicle, at which time emergency personnel smelled alcohol on her breath. Id. at 71-72, 96 A.3d 297. While other emergency personnel remained at the accident scene to continue with their investigation, which took several more hours to complete, one officer proceeded to the hospital to follow up on the defendant's injuries. Id. at 72, 96 A.3d 297.
When the defendant regained consciousness at the hospital, she displayed signs of intoxication, such as slurred speech and inability to answer questions. Ibid. Moreover, the defendant admitted to the officer that she had consumed alcohol earlier. Ibid. Approximately one hour and fifteen minutes after the accident occurred, a nurse drew a sample of the defendant's blood at the officer's **350 request. Ibid. The officer did not seek a warrant before ordering the test because "he was not required to" under standard procedure and had not received training on telephonic warrants. Ibid.
Although the accident occurred pre- McNeely, the defendant moved to suppress the results of the warrantless blood test four months after McNeely was decided. Id. at 73, 96 A.3d 297. Applying that case, the trial court granted the suppression motion, reasoning "that the State had not established that ... 'it would have been impossible for any one of [the officers] to have had the time to call for a search warrant telephonically.' " Id. at 73-74, 96 A.3d 297 (emphasis removed). The trial court also noted that the State had not established the timeframe in which the officer needed to perform the blood-alcohol test in order to obtain a "reasonably fair reading." Id. at 74, 96 A.3d 297.
On appeal, however, an Appellate Division panel reversed, holding that
the "special facts" that supported a warrantless blood sample in Schmerber and were absent in McNeely, were present in this case: an accident, injuries requiring hospitalization, and an hours-long police investigation. Therefore, it was not necessary for the officers to shoulder the further delay entailed in securing a warrant that would have threatened *313 the destruction of the blood alcohol evidence.
[ Id. at 81, 96 A.3d 297.]
The appellate panel also clarified that the State did not need to provide concrete proof that blood-alcohol evidence would have been destroyed before obtaining a warrant-only that any delay would have " 'threatened' its destruction." Id. at 79, 96 A.3d 297. The panel did not reach McNeely's retroactive scope. Id. at 78, 96 A.3d 297.
We summarily remanded the case for reconsideration in light of Adkins. In State v. Jones (Jones II ), the panel "reviewed the facts of this case in light of Adkins to determine whether the situation faced by the officer presented an 'objective exigency.' " 441 N.J. Super. 317, 321, 118 A.3d 352 (2015). The panel conducted a totality of the circumstances analysis and affirmed its prior reversal of the suppression order for substantially the same reasons expressed in its earlier decision. Ibid.
**351 IV.
Applying the principles of Adkins to the facts of this case[1] , as the Appellate Division did in Jones II, we hold that the results of the blood draw should not have been suppressed. An analysis of these specific circumstances established by the trial court leads us to conclude that there existed objective exigency justifying the officers' warrantless taking of defendant's blood sample, though the dissent comes to a different conclusion based upon the same facts.
Defendant's accident was a serious one, requiring the presence of several emergency-services units, the extrication of injured parties from a vehicle with the "Jaws of Life," and the need to transport victims via helicopter to a local hospital. The accident occurred on a typically busy state highway on the night of a nearby event that drew unusually high traffic. In addition to investigating the role played by alcohol in the crash, the officers present had to direct car flow, examine the wreckage, interview parties and witnesses, and document their actions, among other essential tasks.
We conclude that any delay in seeking to obtain defendant's blood sample after the establishment of probable cause is attributed to the complexity of the situation and the reasonable allocation of limited police resources-not a lack of emergent circumstances, as argued by defendant. We further find that the hour for which the officer was forced to wait at the hospital before obtaining the blood sample does not undermine the State's claim of exigency.
Equally unavailing is defendant's reliance on the technical existence of telephonic warrants. Such an argument ignores both the impracticality of the warrant system in place at the time of the accident and the police officers' genuine pre- McNeely belief that a warrant was not compulsory. It is undisputed that there was no **352 established framework for obtaining a warrant via telephone in the State or in Monmouth County at the time of the accident and that, even had there been such an established system, Freehold Township officers were not trained in using it. Defendant contends that the officers could reasonably have learned of the availability of telephonic warrants by consulting a legal authority. But that begs the question-why would the officers seek out legal advice if they had an earnest belief that warrants were not required for blood draws? We conclude that the officers' lack of awareness of any formal *314 procedure through which they could obtain a telephonic warrant, coupled with their pre- McNeely belief that they did not need such a warrant, suggests that there was no reasonable availability of a warrant.
We reject defendant's assertion that a reversal of the trial court's suppression creates a bright-line "accident exception" to the warrant requirement for blood draws in suspected DWI cases. Not every automobile accident produces a set of circumstances sufficient to constitute exigency. Indeed, we can easily foresee situations in which they would not. Our courts are tasked with focusing "on the objective exigency of the circumstances" that officers face in each specific, unique instance. Adkins, 221 N.J. at 317, 113 A.3d 734. Accidents do not, per se, create objective exigency, but the circumstances that accompany them may factor into a court's exigency analysis. See Jones II, 441 N.J.Super. at 321, 118 A.3d 352.
We hold that the facts of this case, in totality, indicate an objective exigency: a fatal accident with multiple serious injuries, the absence of an established telephonic warrant system, and the myriad duties with which the police officers present were tasked. We also afford "substantial weight" to the "potential dissipation of" the alcohol in defendant's blood. Adkins, 221 N.J. at 303, 113 A.3d 734. Therefore, we hold that the warrantless blood draw did not violate defendant's constitutional rights in this case.
**353 V.
We reverse the judgment of the Appellate Division and remand the matter to the trial court for further proceedings.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, and SOLOMON join in JUSTICE FERNANDEZ-VINA's opinion. JUSTICES ALBIN and TIMPONE filed a separate, dissenting opinion.
JUSTICE ALBIN and JUSTICE TIMPONE, dissenting.
In Missouri v. McNeely, the United States Supreme Court held that, in the absence of exigent circumstances, the police must secure a search warrant for a non-consensual draw of a suspected drunk driver's blood. 569 U.S. 141, 152, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013). The natural dissipation of alcohol in the blood is not itself a sufficient exigency to justify suspending the warrant requirement. Id. at 165, 133 S.Ct. 1552. We held in State v. Adkins that McNeely must be given pipeline retroactive application to cases such as the one before us. Adkins, 221 N.J. 300, 313, 113 A.3d 734 (2015).
Despite our declaration in Adkins, the majority has failed to apply McNeely's clear holding to the facts of this case. This Court also has failed to adhere to a deferential standard of review, which requires that we sustain the trial court's factfindings supported by sufficient credible evidence. See State v. Hubbard, 222 N.J. 249, 262, 118 A.3d 314 (2015). The trial court made detailed factfindings after hearing considerable testimony and found that no exigency justified the warrantless blood draw from defendant. The Appellate Division correctly affirmed the trial court's order suppressing the blood results as the fruits of a Fourth Amendment violation.
Because the majority erred in reversing the Appellate Division, we respectfully dissent.
**354 I.
The trial court took testimony from five witnesses at a suppression hearing. The testimony relied on by the trial court and *315 largely ignored by the majority is set forth below.
On the evening of July 27, 2011, shortly before 8:30 p.m., a serious two-car accident occurred at a point on Route 522, where it is a rural two-lane county roadway in Freehold Township.[1] Responding to the accident scene were Officers Braxton, Hudak, Mandela, Gallo, and Sergeant Hall from the Freehold Township Police Department; Detective Kerecman from the Monmouth County Prosecutor's Office; four law enforcement officers from the Serious Collision Analysis Response Team; firefighters from a nearby firehouse; emergency medical service responders; hospital paramedics; and three medevac helicopters.
Upon Officer Hudak's arrival at approximately 8:35 p.m., Officer Braxton, Officer Mandela, and Sergeant Hall were already checking on the victims. Defendant, the driver of one of the wrecked vehicles, was unconscious, and her two passengers were seriously injured. The operator of the other vehicle told Officer Hudak that defendant's car, which was traveling in the opposite direction on Route 522, swerved into his lane, causing the collision.
When Detective Kerecman arrived at 9:05 p.m., Route 522 was closed and the scene was secured. Shortly after his arrival, there were approximately ten law enforcement officers at the accident site, all equipped with cell phones. Also present were fire department and first aid personnel along with three helicopters. At approximately 9:25 p.m., a paramedic advised Detective Kerecman that defendant, still unconscious, had a strong odor of alcohol emanating from her. Additionally, around that time, all the injured parties were transported to medical facilities. Officer Hudak testified that by 9:20 p.m., he had observed a small alcohol bottle on **355 the console of defendant's vehicle, and first aid personnel had told him that defendant smelled of alcohol. By 9:20 p.m., according to Officer Hudak, he had probable cause to secure a blood sample from defendant.[2] Nevertheless, Officer Braxton was not dispatched to the hospital to obtain a blood sample from defendant until 10:36 p.m. Officer Braxton arrived at the hospital at 10:53 p.m. and waited there until 12:05 a.m. when the blood sample was drawn. While he waited, Braxton communicated by cell phone with his superiors.
During the intervening two hours and forty-five minutes between 9:20 p.m., when the officers first had probable cause, and 12:05 a.m., when the blood sample was taken, the officers made no effort to obtain a warrant. Indeed, the law enforcement officers never discussed securing a telephonic search warrant.
The trial court made the following critical factfindings: (1) the officers had probable cause to secure a warrant for a blood draw at 9:20 p.m.; (2) they waited one hour and sixteen minutes before dispatching Officer Braxton to the hospital to obtain a blood sample; (3) the State did not present evidence that the delay in dispatching an officer to obtain a blood sample "was the result of attention diverted by the investigation or because individuals were injured or hospitalized"; (4) "the officers' unexplained and inexplicable delay, and not any 'perceived dissipation' [of alcohol in defendant's blood], ... created the purported exigency"; (5) "judges [were] available 'on call' after normal working hours by telephone *316 and in person for the purpose of obtaining search warrants"; (6) "[t]he officers here had telephonic search warrants available to them, but it was the [Monmouth County Prosecutor's Office's] decision and practice not to seek them"; (7) had the officers utilized the procedures available, "they would have had more than ample time to attempt to apply for a telephonic search warrant pursuant to R. 3:5-3(b)"; and (8) the State failed to carry **356 its burden of showing that "the officers could not [have] 'reasonably obtain[ed] a warrant ... without significantly undermining the efficacy of the search,' " (quoting McNeely, 569 U.S. at 152, 133 S.Ct. 1552 ).
All of those factfindings are supported by sufficient credible evidence in the record.
II.
The trial court did precisely what this Court told it to do in Adkins-apply McNeely to the present case. In McNeely, the United States Supreme Court held that "the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." 569 U.S. at 165, 133 S.Ct. 1552. During a drunk driving investigation, if police officers "can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." Id. at 152, 133 S.Ct. 1552. The Supreme Court explained in McNeely that it was merely applying the "totality of the circumstances approach" set forth in Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) -a case involving a blood draw following an automobile accident-for the purpose of determining whether an exigency justified overriding the warrant requirement. Id. at 150-51, 133 S.Ct. 1552. In Adkins, we determined that under federal law we had to apply McNeely retroactively to all cases in the pipeline on direct review. 221 N.J. at 313, 113 A.3d 734. The present case is one such example.
Significantly, McNeely envisioned instances where the warrant process would "not significantly increase the delay before [a] blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer." 569 U.S. at 153, 133 S.Ct. 1552 (emphasis added). The Court concluded that "[i]n such a circumstance, there would be no plausible justification for an exception to the warrant **357 requirement." Id. at 153-54, 133 S.Ct. 1552. Here, no effort was made to secure a warrant for a blood draw, not during the more than one hour the officers remained on the scene after they had established probable cause, not during Officer Braxton's seventeen-minute drive to the hospital, and not during Braxton's more than one-hour wait at the hospital before medical staff took a blood sample.
The majority has merely substituted its own conclusions-unsupported by the evidence-for the meticulous factfindings made by the trial court. The majority discerns exigent circumstances in "the complexity of the situation" facing the police officers. However tragic the motor vehicle accident was in this case, it was no more complex than other serious accidents. According to the findings of the trial court, the roadway was closed and the scene was secured within an hour after the accident, and there were more than enough police officers available to allow for the obtaining of a warrant. Two hours and forty-five minutes passed from the time the police had probable cause to the time of the warrantless blood draw. As the trial court concluded, self-created exigencies cannot *317 trump the warrant requirement. See State v. Walker, 213 N.J. 281, 295, 62 A.3d 897 (2013).
The reality is that police officers in Monmouth County at the time did not bother to secure warrants for blood draws in alcohol-related automobile accident cases. The post-hoc exigent circumstances discovered by the majority is at odds with the evidence and the trial court's factfindings and does not meet the test in McNeely.
The majority's reliance on "the officers' lack of awareness of any formal procedure through which they could obtain a telephonic warrant," ante at 352, 180 A.3d at 314, to justify noncompliance with the warrant requirement cannot excuse a violation of the Fourth Amendment. An officer's ignorance of the law does not justify the violation of a person's federal constitutional rights. Screws v. United States, 325 U.S. 91, 129, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) ("Ignorance of the law is no excuse for men in general.
**358 It is less an excuse for men whose special duty is to apply it, and therefore to know and observe it."). Officers are presumed to know about the Fourth Amendment's warrant requirement and Supreme Court precedents that govern their conduct. Heien v. North Carolina, 574 U.S. ----, 135 S.Ct. 530, 539-40, 190 L.Ed.2d 475 (2014). The rights protected by the Constitution are not dependent on whether a state trains its officers on the mandates of the warrant requirement. No one would suggest that the violation of a defendant's Miranda rights could be justified because a police department failed to train its officers on the dictates of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). State practices must adhere to the dictates of the Federal Constitution.
III.
In conclusion, the majority has not recited fully the facts in this case. The majority moreover has not applied the principles set forth in McNeely, as required by Adkins. Warrantless searches are presumptively invalid. State v. Edmonds, 211 N.J. 117, 130, 47 A.3d 737 (2012). The State had the burden of proving that exigent circumstances made it impracticable to obtain a warrant for a blood draw. See McNeely, 569 U.S. at 160, 133 S.Ct. 1552. The State failed to meet that burden. The trial court found that the State did not establish that in the two hours and forty-five minutes available, it was impracticable to attempt to secure a telephonic warrant. The Appellate Division affirmed because the trial court's factfindings are supported by sufficient credible evidence in the record. In substituting its own factfindings for those of the trial court, the majority has not adhered to the deferential standard of review that should guide this Court in reviewing a suppression order.
The majority's finding that a warrantless blood draw was permissible in this case, which involved no true exigency, effectively renders McNeely a nullity and undoubtedly will be cited to justify **359 further end-runs around the warrant requirement. For those reasons, we respectfully dissent.

The dissent's overly rigid interpretation of Adkins misses the thrust of its meaning.

The majority's characterization of the roadway where the accident occurred as "a major thoroughfare" and "a typically busy state highway" is not supported by the record.

By 9:45 p.m., Detective Kerecman also observed the bottle of alcohol on the console of defendant's vehicle.