**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0674-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DORIAN GRAHAM,
a/k/a DORIAN M. GRAHAM,
DORIAN MOORE, and DORIAN
M. GRAHAM-MOORE,

    Defendant-Appellant.

_____

Submitted January 19, 2022 – Decided March 15, 2022

Before Judges Mayer and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 17-03-0285 and 18-04-0608.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (Patrick F. Galdieri, II, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

After the court denied defendant's motion to suppress evidence, reveal the identity of a confidential informant, and for a <u>Franks</u>[1] hearing, he pled guilty to first-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); second-degree certain persons not to have a weapon, N.J.S.A. 2C:39-7(b)(1) (nine-millimeter handgun); and third-degree possession of a controlled dangerous substance (CDS) (heroin) with intent to distribute within 1,000 feet of school property, N.J.S.A. 2C:35-7(a). The court imposed an aggregate fifteen-year prison sentence with eight years of parole ineligibility and issued an amended Judgment of Conviction (JOC) to memorialize jail credits it previously awarded at defendant's sentencing proceeding.

Before us, defendant raises the following arguments:

> I.  A REMAND IS NECESSARY AS THE MOTION COURT FAILED TO EVALUATE ALL OF THE NECESSARY PRONGS IN AN INDEPENDENT SOURCE ANALYSIS.
>
> II.  THE STATE FAILED TO CARRY ITS BURDEN OF ESTABLISHING ALL OF THE NECESSARY PRONGS OF THE INDEPENDENT SOURCE DOCTRINE.

---

[1] <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

III. THE JUDGMENT OF CONVICTION FOR THE UNLAWFUL POSSESSION OF A WEAPON MUST BE CORRECTED AS THAT OFFENSE IS A SECOND-DEGREE OFFENSE, NOT A FIRST-DEGREE OFFENSE.

IV. THE AMENDED JUDGMENT OF CONVICTION MUST BE STRUCK BY THIS COURT OR THE MATTER MUST BE REMANDED FOR FURTHER PROCEEDINGS AND TO PROVIDE MR. GRAHAM THE OPPORTUNITY TO BE HEARD.

Further, in a pro se submission, defendant contends the warrant that permitted a search of his vehicle did not authorize the police to explore the internal, hidden compartments, warranting suppression of the CDS and firearm discovered. He also maintains that the affidavit submitted to the court in support of the application for the relevant warrant was insufficient to establish probable cause to search defendant and his vehicle.

Having considered the record in light of the applicable law, we reject all of defendant's arguments and affirm. As detailed in point VI, however, we note an inconsistency between defendant's plea and sentence with respect to the distribution of heroin within 1,000 feet of a school charge, and a previous order of the court that seemingly dismissed that offense. Accordingly, we direct the parties to address that issue, as appropriate, before the trial court in the first instance.

3

I.

We begin our discussion with the material facts distilled from the affidavits filed in support of the search warrants that led to the seizure of the nine-millimeter handgun and CDSs at issue, and which were presented to the court in the context of defendant's Franks motion.

In September 2016, Detective Michael A. Carullo of the Edison Police Department applied for search warrants for 136 Hillcrest Avenue in Edison, 5205 Buttonwood Court in South Brunswick, a black 2008 Mercedes Benz C300, a white 2007 BMW 6 Series, defendant, and his eventual codefendant Jamie Monroe. After these warrants were executed, Detective Carullo applied for additional warrants in September 2016 to conduct a further search of the Mercedes and the BMW, and for a gray Dodge Ram. Finally, Detective Carullo applied for search warrants in October 2016 for six identified cell phones recovered during previous searches.

According to Detective Carullo's affidavits, in April 2016, a "concerned citizen" contacted Detective Carullo and informed him that an individual, later identified as Jamie Monroe, was distributing heroin out of a rear entrance of a home on Jeremy Court in Edison and that a black Mercedes would be in the parking lot during these sales. Another person who was arrested by the East

Brunswick Police Department advised that Monroe was her heroin dealer and that she assisted him in "bagging" approximately one hundred "bricks" of heroin at the Jeremy Court address.

In May 2016, the same concerned citizen advised Detective Carullo that a heroin sale was about to occur at the Jeremy Court address. Detective Carullo established surveillance and observed Monroe arrive in a Dodge Ram, enter the building, and engage in "what appeared to be a hand-to-hand transaction" with a male. Police later arrested the male and recovered heroin from him.

That same month, confidential informant (CI) number one, a "reliable . . . informant who had previously provided information to law enforcement that . . . led to arrests and prosecutions," told Detective Carullo that Monroe and defendant were working together to distribute heroin and cocaine throughout Middlesex County and that they utilized the Jeremy Court and Hillcrest Avenue locations to package heroin.

CI number one further stated that defendant was known to drive a Mercedes and that Monroe drove a BMW or Dodge Ram, all which the CI described with particularity. The CI also stated defendant and Monroe "were known . . . to occasionally share" vehicles in their operation and explained to Detective Carullo that at least one of the vehicles was believed to have hidden

5

compartments. Finally, the CI revealed that Monroe and defendant carried firearms. After searching Department of Motor Vehicle Commission records, the police learned that the BMW and Mercedes were registered to defendant and that Monroe was registered as a co-owner of the BMW.

Between May 22 and June 4, 2016, CI number one completed three controlled purchases of heroin. First, CI number one met defendant, who was driving the Mercedes, at a public place in Edison. Next, the informant met Monroe outside the Hillcrest Avenue address, where the BMW was parked. Third, after surveillance observed defendant and Monroe arrive at the Hillcrest Avenue location driving the Mercedes and the Dodge Ram, CI number one completed a purchase from a female outside that location.

In June 2016, CI number two, a different confidential informant that law enforcement also established as credible, reported to Detective Carullo information similar to that which CI number one initially provided. CI number two also indicated Monroe and defendant "most recently" used the Hillcrest Avenue residence to package heroin.

In or around June 2016, CI number two completed two controlled heroin purchases in public places, one from defendant and one from Monroe. CI

A-0674-19

number two completed an additional controlled purchase from defendant in July 2016.

According to the affidavits, several controlled purchases were conducted in August 2016. First, CI number two completed two purchases in public places, one from defendant and one from Monroe. Second, undercover investigators made two purchases from Monroe. Both times surveillance observed Monroe leaving the Buttonwood Court address before traveling to the meeting location.

Thereafter, an undercover investigator arranged another purchase from Monroe. During that transaction, surveillance observed Monroe meet with defendant and place packages in the Mercedes and BMW. The pair then departed in the BMW. Upon arriving at the meeting location, Monroe exited the car and completed the sale, while defendant circled the area in a manner "consistent with conducting counter-surveillance." Subsequently, CI number one completed a final August 2016 controlled purchase from defendant.

Also in August 2016, police surveillance observed Monroe completing "what appeared to be a hand-to-hand transaction" in a Wendy's parking lot, and defendant doing the same in the area of a Burger King. Around the same time, a concerned citizen contacted the Edison Police Department and advised that there was an "unusual amount of vehicular traffic" in front of the Hillcrest

A-0674-19

Avenue address, and that individuals would come outside to meet the vehicle occupants "for very brief periods of time before they returned to the residence and vehicles departed the area."

In or around September 2016, CI number one completed another controlled purchase from Monroe. Finally, in early September 2016, surveillance observed Monroe engage "in what appeared to be a hand-to-hand transaction" at a gas station.

In his initial affidavit, Detective Carullo stated that "the two . . . reliable confidential informants indicated that the described vehicle may have a hidden 'trap' compartment" and that "traffickers of narcotics often secrete evidence of narcotic activity and distribution as well as weapons in areas so as to be hidden and disguised from law enforcement." As such he "request[ed] permission to access and search [the listed vehicles] using more intrusive means." His subsequent affidavit contained a similar request.

On September 15, 2016, police executed court authorized search warrants for Monroe, the Buttonwood Court residence, and the BMW. During a search of the property, a canine alerted to the presence of narcotics in the Dodge Ram, which was parked on the property, and Detective Carullo noticed from a non-intrusive visual inspection that the front passenger side airbag appeared to have

8

a hidden compartment. From the Buttonwood Court residence, police recovered two ounces of heroin, a bullet-proof vest, and five handguns. After a sniff of the BMW, the canine also alerted to the presence of narcotics in what later were confirmed to be hidden compartments of the car.

On the same day, police also executed court-authorized search warrants for defendant, the Mercedes, and the Hillcrest Avenue residence. A canine sniff of the Mercedes indicated the presence of narcotics in the back seat area. Detective Carullo later discovered and forced open a hidden compartment in the front passenger seat back containing a loaded handgun, a loaded magazine, and suspected heroin and fentanyl. At the Hillcrest Avenue residence, police recovered empty, unused glassines used to package heroin and a stamp used to label the bags.

In Indictment No. 17-03-285, a Middlesex grand jury charged defendant with certain persons not to have a weapon. In a separate Indictment, No. 18-04-608, a Middlesex grand jury charged defendant, Monroe, and another alleged co-conspirator, with numerous offenses in twenty-six counts, fourteen of which the State asserted against defendant.

The charges against defendant included: second-degree conspiracy, N.J.S.A. 2C:5-2 (counts two and four); first-degree maintaining a CDS

production facility, N.J.S.A. 2C:35-4 (count three); third-degree distribution of CDS, N.J.S.A. 2C:35-5(a)(1), (b)(3) (count six); second-degree possession with intent to distribute, N.J.S.A. 2C:35-5(a)(1), (b)(2) (count seven); third-degree possession with intent to distribute, N.J.S.A. 2C:35-5(a)(1), (b)(3), (b)(13) (counts seventeen and eighteen); third-degree possession with intent to distribute on or near school property, (counts nineteen and twenty); second-degree possession of a firearm while possessing CDS with intent to distribute, N.J.S.A. 2C:39-4.1 (count twenty-one); first-degree unlawful possession of a weapon, (count twenty-two); fourth-degree possession of a large capacity ammunition magazine, N.J.S.A. 2C:39-3(j) (counts twenty-three and twenty-four); third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1) (count twenty-five); and fourth-degree possession with intent to distribute paraphernalia, N.J.S.A. 2C:36-3 (count twenty-six).

Defendant moved to dismiss the charges.[2] In a March 9, 2018 order, a motion judge granted defendant's application in part and dismissed counts seventeen through twenty-one. The order, however, referenced Indictment No. 17-03-283, which appears to have been a clerical error as that indictment

---

[2] The record does not include a transcript of the proceeding related to defendant's motion to dismiss.

A-0674-19

charged but a single count. We accordingly presume the court intended the order to reference Indictment No. 18-04-608, thereby dismissing the charges of possession with intent to distribute, possession with intent to distribute near school property, and possession of a firearm while possessing CDS with intent to distribute.

As noted, defendant thereafter moved for a <u>Franks</u> hearing, to suppress evidence, and to disclose the identity of one of the confidential informants. Monroe testified during the evidentiary hearing that the affidavit contained an erroneous statement of fact. Specifically, he stated that he completed a single sale in a particular week of August 2016, which he believed involved an undercover officer and a confidential informant, whereas the affidavit erroneously described two separate sales.

In a July 13, 2018 oral decision, the motion judge denied defendant's request for the State to disclose the identity of the confidential informant after finding that the disclosure would not assist in the defense of the charges against defendant. The court similarly denied defendant's request to suppress any evidence seized based on a <u>Franks</u> violation, and noted that even if it ignored one of the August 2016-controlled purchases referenced in the affidavit, there were still other controlled buys that established probable cause. The court also

11

concluded there was nothing in the affidavits indicating that Detective Carullo "engaged in some kind of willful misleading or willful falsehood or . . . deliberate[] lying" that would require relief under Franks.  The judge denied defendant's motion in a corresponding order dated February 22, 2019.

A different judge accepted defendant's negotiated plea to the charges of certain persons not to have a weapon (the sole count in Indictment No. 17-03-285), possession of heroin with intent to distribute near school property, and unlawful possession of a weapon (counts nineteen[3] and twenty-two of Indictment No. 18-04-608).  During defendant's plea colloquy, with regard to count twenty-two, defendant admitted that he had a handgun without first obtaining a permit, he knew it was illegal, and he was being convicted under the first-degree because he had a prior conviction for robbery.  Similarly, regarding the charge under Indictment No. 17-03-285, defendant testified that due to a previous conviction it was illegal for him to possess a firearm, and he did in fact possess a firearm.  Finally, regarding count nineteen, defendant admitted to

---

[3]  As detailed in section VI, the parties have not explained the circumstances surrounding defendant's guilty plea to count nineteen after the motion judge had seemingly dismissed that charge in his March 9, 2018 order.  Nor does the record, including defendant's written plea form or the plea hearing, add clarity to the issue.

12

possessing heroin "with the intention to transfer it or sell it to other people . . . within 1,000 feet of . . . the Darul Arqam School" in South River.

The same judge sentenced defendant to a three-year term with three years of parole ineligibility under count nineteen; a twelve-year term with five years of parole ineligibility under count twenty-two; and a five-year term with five years of parole ineligibility under Indictment No. 17-03-285, with count nineteen to run consecutive to count twenty-two. The judge also stated defendant was entitled to 1,083 days of jail credits related to count twenty-two. Those credits were memorialized in the initial September 5, 2019 JOC. The JOC, however, did not specifically reflect that the credits would apply only to count twenty-two, resulting in the court amending the JOC, sua sponte, on that same day. This appeal followed.

## II.

In defendant's first two points he contends the court applied an improper analysis in denying his motions for a Franks hearing and to suppress evidence seized pursuant to the search warrants.[4] Specifically, he claims that in response to Monroe's testimony detailing an alleged inaccuracy in the affidavits regarding a particular controlled purchase, the court should have conducted an

---

[4] The record does not contain the warrants.

independent source analysis. Instead, he contends the court erroneously determined that the affidavits established probable cause even ignoring the disputed transaction.

As best we can discern, he further argues that but for the complained of transaction, the police would not have obtained the additional information contained in the affidavits, and that the State did not establish the absence of "flagrant police misconduct." Finally, defendant asserts the flagrancy of the police conduct is "hidden behind a veil" because the State did not reveal the identity of the confidential informant.[5] Defendant's arguments are without merit.

We employ a deferential standard when reviewing a trial court's ruling on a motion to suppress. State v. Zalcberg, 232 N.J. 335, 344 (2018). The trial court's factual and credibility findings will be set aside "only when [the] court's findings of fact are clearly mistaken . . . [and] the interests of justice require the reviewing court to examine the record, make findings of fact, and apply the

---

[5] Despite referencing the court's denial of his motion for disclosure of the identity of a CI, defendant has not specifically briefed any issue regarding that ruling. We, therefore, consider any such argument waived. See N.J. Dep't of Envtl. Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal."). We nonetheless have considered the propriety of the court's ruling and find any challenge to it to be without merit. See R. 2:11-3(e)(2).

governing law." Ibid. (alterations in original) (quoting State v. Hubbard, 222 N.J. 249, 262-63 (2015)). We use a de novo standard to review legal issues. Ibid.

A search that is executed pursuant to a warrant is 'presumptively valid,' and a defendant challenging the issuance of that warrant has the burden of proof to establish a lack of probable cause 'or that the search was otherwise unreasonable.'" State v. Boone, 232 N.J. 417, 427 (2017) (quoting State v. Watts, 223 N.J. 503, 513-14 (2015)). "[A]n appellate court's role is not to determine anew whether there was probable cause for issuance of [a] warrant, but rather, whether there is evidence to support the finding made by the warrant-issuing judge." State v. Chippero, 201 N.J. 14, 20-21 (2009). Reviewing courts "accord substantial deference to the discretionary determination resulting in the issuance of [a] warrant." State v. Marshall, 123 N.J. 1, 72 (1991).

"Courts consider the 'totality of the circumstances' and should sustain the validity of a search only if the finding of probable cause relies on adequate facts." Boone, 232 N.J. at 427 (quoting State v. Jones, 179 N.J. 377, 388-89 (2004)). "[T]he probable cause determination must be . . . based on the information contained within the four corners of the supporting affidavit, as supplemented by sworn testimony before the issuing judge that is recorded

contemporaneously." Ibid. (alteration in original) (quoting State v. Marshall, 199 N.J. 602, 611 (2009)).

A "search warrant enables law enforcement to search property where there is reason to believe, to a reasonable probability, that the fruits, instrumentalities, or other evidence of a crime may be found." Chippero, 201 N.J. at 29 n.6. A judge's "inquiry in respect of a search warrant must assess the connection of the item sought to be seized 1) to the crime being investigated, and 2) to the location to be searched as its likely present location." Id. at 29.

Defendant argues he was entitled to a Franks hearing because Monroe's testimony detailed alleged falsities in Detective Carullo's affidavits. To obtain a Franks hearing, a defendant "must make a 'substantial preliminary showing' of falsity in the" affidavit supporting the issuance of the warrant. State v. Howery, 80 N.J. 563, 567 (1979) (quoting Franks, 438 U.S. at 170). The "defendant cannot rely on allegations of unintentional falsification" but instead "must allege 'deliberate falsehood or reckless disregard for the truth.'" Ibid. (quoting Franks, 438 U.S. at 171). In addition, "the misstatements claimed to be false must be material to the extent that when they are excised from the affidavit, that document no longer contains facts sufficient to establish probable cause." Id. at 568; see also State v. Goldberg, 214 N.J. Super. 401, 406 (App. Div. 1986)

("[B]efore a defendant is entitled to an evidentiary hearing to challenge the veracity of the contents of a police officer's affidavit or . . . testimony given in support of a search warrant, it must be demonstrated, among other things, that the allegedly false statements were essential to support a probable cause determination.").

Here, a Franks hearing was not required. First, Monroe's testimony alone did not amount to a "'substantial preliminary showing' of falsity" in the affidavits. Howery, 80 N.J. at 567 (quoting Franks, 438 U.S. at 170). Second, defendant offered no proof that any falsity in the affidavits was "deliberate" or the result of a "reckless disregard for the truth." Ibid. (quoting Franks, 438 U.S. at 171).

Third, and significantly, Detective Carullo's affidavits provided overwhelming support for the existence of probable cause, rendering any misstatement of fact revealed by Monroe's testimony immaterial to the court's decision to issue the warrants. See id. at 568; Goldberg, 214 N.J. Super. at 406. Indeed, the affidavit described numerous controlled CDS purchases involving undercover police and confidential informants, multiple observations of hand-to-hand transactions involving third parties, and information obtained from multiple sources including two reliable confidential informants.

17

The independent source doctrine, as applied to the facts here, provides no support for defendant's argument that the court improperly denied his motion to suppress. That doctrine "allows for the introduction of evidence tainted by unlawful police conduct if the information leading to discovery of the evidence is independent of the previous unlawful conduct." State v. Camey, 239 N.J. 282, 310 (2019) (citing Nix v. Williams, 467 U.S. 431, 443 (1984)). Consequently, the independent source doctrine allows for the "admission of evidence that was discovered wholly independently from the constitutional violation." State v. Shaw, 237 N.J. 588, 621 (2019).

To satisfy the independent source doctrine, the State must prove three elements by clear and convincing evidence: 1) "probable cause existed to conduct the challenged search without the unlawfully obtained information"; 2) "the police would have sought a warrant without the tainted knowledge or evidence that they previously had acquired or viewed"; and 3) "the initial impermissible search was not the product of flagrant police misconduct." Camey, 239 N.J. at 310 (quoting State v. Holland, 176 N.J. 344, 360-61 (2003)). "Flagrancy is a high bar, requiring active disregard of proper procedure, or overt attempts to undermine constitutional protections." Ibid.

Because the record contains no proof of unlawful police activity, the independent source doctrine is inapplicable. Although we accordingly find the remainder of defendant's arguments regarding the independent source doctrine without merit, we nevertheless conclude that if the doctrine did apply it would have allowed introduction of the evidence. Here, the motion court correctly found that the affidavits established probable cause even ignoring the challenged transaction. See ibid. Indeed, the lengthy investigation conducted by the Edison Police Department, which had gathered substantial evidence before the challenged transaction, fully supports the conclusion that Detective Carullo possessed sufficient information to obtain a warrant even had the disputed transaction not occurred. See ibid.

III.

Defendant next argues that his JOC should be vacated, or the matter remanded for further proceedings, because the court improperly "increased" his negotiated sentence without notice or an opportunity to be heard" when it amended the JOC to apply jail credits solely to count twenty-two "in secret" and by "judicial fiat." Defendant states he had a "presumed expectation" that jail credits would be applied to "both" of his consecutive sentences. We disagree.

A-0674-19

It is well-settled that courts can correct errors in sentencing without violating a defendant's fundamental rights. Over fifty years ago, our Supreme Court held in State v. Matlack that errors in sentencing may be corrected under the Rules. 49 N.J. 491, 501-02 (1967). Specifically, the Court stated that "[n]o fundamental right of defendant will be violated if an inadvertent clerical-type error is corrected, and he receives the sentence which the trial judge intended him to receive." Id. at 502. Accordingly, Rule 1:13-1 provides:

> Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight and omission may at any time be corrected by the court on its own initiative on the motion of any party, and on such notice and terms as the court directs, notwithstanding the pendency of an appeal.

See also State v. Abril, 444 N.J. Super. 553, 564 (App. Div. 2016) ("In the event of a discrepancy between the court's oral pronouncement of sentence and the sentence described in the judgment of conviction, the sentencing transcript controls, and a corrective judgment is to be entered.").

Further, contrary to defendant's contention, amending a judgment of conviction to conform to the court's oral sentencing ruling does not require resentencing, defendant's presence, or notice in all instances. In State v. Pohlabel, we explained that "where there is a conflict between the oral sentence and the written commitment, the former will control if clearly stated and

adequately shown, since it is the true source of the sentence, instead of the latter which is merely the work of a clerk." 40 N.J. Super. 416, 423 (App. Div. 1956).

We therefore have held that to the extent there is a conflict between the oral sentence and the written commitment, the latter "must be regarded as a clerical mistake, subject to correction by the court, with or without notice." Ibid. We reasoned that in those circumstances, "there was no occasion for notice" because the correction would not "impair[] any substantive right of the defendant," and "because it merely conformed the official record with the oral sentence imposed in the first instance." Ibid.; see also Rule 1:13-1; State v. Randolph, 210 N.J. 330, 351 (2012).

Here, the sentencing judge did not err in amending defendant's judgment of conviction. As indicated, the judge stated during the sentencing hearing that defendant was entitled to "1,083 days of jail credits that will be [applied to] count [twenty-two]." Defendant did not object to that finding before the court, nor does he challenge it before us, or the similar notation regarding the amount of jail credits contained in the presentence report.

As noted, the court originally entered the JOC on September 5, 2019. That JOC reflected the amount of jail credits, but it did not specifically state that the credits would apply to count twenty-two. The court therefore issued an amended

21

JOC that same day captioned "Clarification of Jail Credit" to indicate the jail credits applied specifically to count twenty-two. In doing so, the court acted within its authority when amending the JOC to conform it to its oral decision, to which defendant lodged no objection.

Finally, to the extent defendant contends he had an expectation that his jail credits would be double counted, that belief has no basis in law. See State v. C.H., 228 N.J. 111, 121 (2017) (holding, in the context of consecutive sentencing, double counting "would lead to the perverse result that a defendant held in custody would be better off than one released on bail or supervision"). We find defendant's argument attempting to distinguish C.H. based on his consecutive sentences being imposed under a single indictment unpersuasive. C.H. makes clear that "double credit is not allowed," and its holding did not turn on the existence of multiple indictments. Ibid.

IV.

Defendant, in his pro se supplemental brief, contends for the first time before us that the evidence seized from his Mercedes should have been suppressed as the search exceeded the permissible scope authorized by both the search warrant and relevant case law and was therefore unreasonable. He relies specifically on State v. Cuellar, 211 N.J. Super. 299 (Law Div. 1986), aff'd o.b.,

216 N.J. Super. 249 (App. Div. 1986), and argues the search of his Mercedes "interfere[d] with the structural integrity" of his car. He also contends the affidavit did not contain sufficient probable cause to issue a warrant authorizing the search. We disagree with all of these arguments.

As a preliminary matter, we note defendant's pro se arguments suffer from a series of procedural infirmities. First, defendant failed to raise these arguments below and, as such, the "legal propriety [of those arguments] never was ruled on . . . [and] the issue[s] [were] not properly preserved for appellate review." State v. Robinson, 200 N.J. 1, 18-19 (2009). Further, as defendant's contentions do not "go to the jurisdiction of the trial court or concern matters of great public interest," they do not qualify for an exception to the general prohibition against deciding issues on appeal that were "not properly presented to the trial court." Id. at 20 (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)). Second, as noted, the record does not contain the search warrants at issue and, as such, defendant's contention regarding deficiencies in any warrant issued based on the affidavits is unsupported by the record. For purposes of completeness, we nevertheless address, and reject, defendant's arguments on the merits.

Under the Fourth Amendment to the Federal Constitution and Article I, Paragraph 7 of the New Jersey Constitution, a search warrant must "particularly" describe the area to be searched both to limit discretion of the executing officer and to sufficiently describe the area so that the executing officer can reasonably ascertain the location and search only those places appropriate under the scope of the warrant. State v. Reldan, 100 N.J. 187, 195 (1985) (citing Harris v. United States, 331 U.S. 145, 152 (1947)). The scope of a search warrant is determined by the language in the warrant describing the area and persons to be searched. Id. at 211. Although "pin-point precision" is not required, the warrant must describe the premises to be searched with reasonable accuracy. State v. Wright, 61 N.J. 146, 149 (1972); State v. Bisaccia, 58 N.J. 586, 588 (1971). "A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search." United States v. Ross, 456 U.S. 798, 820 (1982).

In Cuellar, the defendants were stopped by police after speeding and subsequently arrested for drug possession. 211 N.J. Super. at 300. While conducting a search of the vehicle incident to arrest, the officer moved the rear seat forward and found a wall panel that appeared to "pop out." Ibid. The officer then removed the seat and panel to find suspected CDS. Ibid. The trial court

24

found, and we agreed, that the search was unreasonable because "the area . . . was not accessible to the recent occupants of the automobile" and, therefore, not a permissible search incident to arrest. Id. at 303-04.

Here, a warrant was clearly issued that permitted a search of defendant's Mercedes. Thus, the officers were entitled to search the entire vehicle, including areas that "might contain the object of the search." Ross, 456 U.S. at 820. This would include the hidden compartment because a canine sniff indicated the presence of narcotics in the area. Further, Detective Carullo's affidavit specifically explained his suspicion that the vehicles contained hidden compartments and requested permission to search them using "intrusive means."

Defendant's reliance on Cuellar is therefore misplaced as unlike that case, which involved a search incident to arrest, defendant's vehicle was searched pursuant to a warrant and the police appropriately searched those areas where CDSs could be located. Finally, as detailed supra, Detective Carullo's affidavit included probable cause that defendant was engaging in suspected criminal activity based on the information provided by the confidential informants, hand-to-hand transactions observed by officers, and multiple controlled purchases.

25

V.

In his third point, defendant maintains the judgment of conviction "mistakenly" reports the unlawful possession of a weapon charge (count twenty-two) as a first-degree crime instead of second-degree. Again, we disagree.

N.J.S.A. 2C:39-5(b) provides "[a]ny person who knowingly has in his possession any handgun . . . without first having obtained a permit to carry the same as provided in N.J.S.A. 2C:58-4, is guilty of a crime of the second[-]degree." Further, N.J.S.A. 2C:39-5(j) states a violation of subsection (b) is a crime of the first-degree if committed "by a person who has a prior conviction" of robbery, N.J.S.A. 2C:43-7.2(d)(9).

Here, defendant admitted during his plea colloquy that he was in possession of a firearm without first obtaining a permit and that he had a prior conviction for armed robbery. Further, we note that defendant's indictment and plea agreement both indicate his conviction was of the first-degree, not second. Accordingly, the judgment of conviction indicating that defendant was convicted for a first-degree crime was not entered in error.

VI.

We would be remiss if we did not address a significant inconsistency in the record that was not raised by the parties. As noted, in a March 9, 2018 order,

26

the motion judge ordered the dismissal of five counts charged against defendant. While the order referenced Indictment No. 17-03-285, that reference appears to be a clerical error, because that indictment listed only one count. The apparent correct reference should have been to Indictment No. 18-04-608, which, therefore, dismissed count nineteen, the possession with intent to distribute CDS on or near school property, a charge for which defendant pled guilty and was sentenced.

We point out again that we do not have a copy of the transcript of the proceeding related to the March 9, 2018 dismissal order, or any other order or transcript that would shed light on the issue we have addressed above. Accordingly, we conclude the parties, as appropriate, should address the issue in the first instance with the trial court.

To the extent we have not specifically addressed any of defendant's arguments, it is because we have determined they are of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27

A-0674-19